And thanks to both counsel. Our next case for argument this morning is Jason Peterson v. James. Actually, I think the defendant that's left is John Drainon, not Jeanie James. We'll correct the caption. Good morning, Mr. Flaxman. Good morning. May it please the court. Your Honor is correct. The only defendant that the appeal is against is John Drainon. The plaintiff in this case is Jason Peterson. He spent an extra year in prison because defendant Drainon failed to do his job so that Mr. Peterson could be paroled. Drainon was a prison counselor at the Vandalia Correctional Center. When Peterson was coming up for parole, Peterson requested to be released to a halfway house called the Wayside Cross Ministries in Aurora. Drainon's job as a prison counselor was to take requests like that one for them to the parole office for further review. If Drainon doesn't forward the request, it can't be reviewed. The prisoner cannot parole to that site. He's requesting to parole to. So Drainon in this case has a gatekeeper role. Mr. Flaxman, is there any policy or procedure at IDOC that would require Mr. Drainon to submit? Mr. Peterson's request of preference to the parole regulatory group or PRG? The testimony from officer Drainon is that when prisoners make requests for parole sites, it's his job to forward them. He has put forward testimony about two different policies where he wouldn't do it. I can't point you to evidence that says a parole counselor has to forward every single address he gets, but I think that is what that's what his job is. I don't I don't think he's denying that he has. I don't think he's contending. He has absolute discretion to just throw out certain addresses that he's given. The theory is that he's the gatekeeper and unless he forwards an address to the parole resource group, it won't get considered. Just to get the terminology correct, this form of release is not really parole. It's mandatory supervised release. So if I could call it MSR and that would confuse us more, but yeah, the word is mandatory. There's no dispute that if Mr. Peterson has an approved host site, he is released. There's no one has to exercise discretion about that under Illinois law. But it is contingent upon somebody approving the release site. So it's not mandatory in the ordinary sense of that word. That's right. I mean, yes, we're not disputing that there is this necessary step of getting the host site approved. And who sets this date? Is this an administrative date or is this a court set date? The date is set by the court. I think sometimes there's good time and credits like that. But based on the prisoner gets us every prisoner in Illinois gets a sentence of prison time plus a certain time on MSR. Mr. Peterson has a four-year MSR term. And so there's no dispute about what the date is when Mr. Peterson's MSR parole begins. So the only question is whether he met the criteria to be released on MSR on parole. And those criteria are also embedded in state law by statute. It's not it's not some prison regulation. There are both. So there are some conditions of parole that are imposed by the parole board. There are some conditions that are by statute in this case. Mr. Peterson was required to be on GPS by statute. Some other parolees have that requirement that's not required by statute, but it's imposed at the present level. Thank you. And that was as a result of the nature of his conviction. The GPS requirement. So because he was convicted of violating an order of protection, he's required to be on GPS for the time that he's on mandatory supervised release. And no discretion or variation in that is a result of the nature of the conviction. Right. There's no discretion. The one argument the state or the defendant had raised below was that maybe he wasn't required to be on GPS by the time he was finally allowed to parole this site, but they've the law under Illinois law. He was required to be on GPS. And in fact, the evidence is that he was on GPS. And that's in our view, the key evidence is that once Mr. Peterson transferred to another prison and once a different prison counselor was reviewing his request, that prison counselor forwarded the request to the other office within the Department of Corrections. The request was approved and Mr. Peterson was allowed to be released. What about Mr. Drennan's testimony that the reason he didn't think that Wayside was available because he had a conversation with someone from Wayside and he had some conversation with someone from the parole group. Well, based on the evidence I just referenced about what happened later, we know that whatever Mr. Drennan believed or claims to believe was incorrect. But how do we know that? How do we know that at the time that Mr. Drennan heard that that Wayside either was at capacity or had a different policy versus later on? Yeah, we have evidence testimony from Mr. Peterson that Wayside told him there's a bed available for you and we take GPS. So I mean that this is if this is a we have the same kind of evidence on both sides about that issue. And the whether or not Mr. Drennan was truly relying on these beliefs is a question that should go to the jury because especially where we have in black and white Drennan's response to the grievance that said doesn't say well, I know that you can't go to Wayside because their capacity or they don't take GPS. It says per IDOC. There's a rule that says you can't go to a halfway house with GPS and that's that's the reason that Mr. Peterson got at the time that was the claim that I'm applying this rule that we now know doesn't exist. What that suggests that officer Drennan was mistaken. Does it support an inference of deliberate indifference the court's precedent from the figs case in the Huber case? Yes say that a jury can find deliberate indifference when a prison official in a situation like this is is so their work is so ineffectual that it can rise to the level of deliberate indifference, but that involved a miscalculation of a of a parole date. Well, those cases involve miscalculations, but they stand for a proposition that once a parole once a prison official knows there's a problem and someone's not being released they have a duty to do some investigation and once Drennan is put on notice especially once he's put on notice that Mr. Peterson has a spot at this halfway house that will take him with GPS Drennan has to do something more than just say no, I'm continuing to apply this rule that doesn't exist. The language in deliberate indifference cases talk about substantial departures from professional judgment talk about conduct that's so blatantly inappropriate that it's our position that a jury could take the evidence that Drennan was applying a rule that didn't exist and make those findings. The one other point I will make is that this the defendant is relying on a different rule on appeal this claim that Drennan wasn't allowed to submit a specific halfway house for review. We pointed to the evidence in the record showing that the other counselor at the other prison did just that and a jury could look at that and say well that rule doesn't apply either and here is the second time trying to apply a rule that doesn't exist. It's clear that this is more than just a mistake. This is going against all of the you know, what we would expect from a professional in this situation. This is so into ineffectual under the circumstances that a jury can find deliberate indifference. There are other questions. I'll reserve the remaining time. Thank you. Fine. Thank you. Mr. Sheffield. Good morning, Your Honors. Jonathan Sheffield representing Apple East. This court should have from the entry of summary judgment on Peterson's Eighth Amendment claim because he failed to show as a matter of law that Drennan was deliberately indifferent to Peterson's efforts to find a placement for mandatory supervised release or responsible for investigating halfway houses. To begin the Drennan's conduct does not demonstrate a sufficiently culpable state of mind each time. He was presented with a release plan request rather request for a release plan from Peterson. He put that into the inmate tracking system. He passed that along to the parole division and I understand that there are a few different terms being thrown around here, but my understanding from the record is the parole defender services unit for GPS monitoring finding locations for them and the parole resource group that was responsible for locating halfway houses. So after that Drennan was not contacted again about Wayside until he was in the role of a grievance reviewer in December of 2018. So that's five months between receiving this request and then getting a grievance about that and in that time the field services office Drennan which Drennan was a part of had already submitted home sites with according to Peterson without any problems or issues in getting those passed along to the parole division for investigation. Now, unfortunately those were not approved and the date on which is mandatory supervised release began came and went without an approved residence and that is the condition of met until January of 2020, but I'll note that in the nine months that he spent at Vandalia on mandatory supervised release that he communicated to defendant Drennan eight times, excuse me, defendant Drennan communicated to Peterson eight times. It's reflected in counseling notes and each time letting him know about updating him on the status of the parole agent's discretion and even offering to speak to a potential host site and in that time in those nine months Drennan did not receive another request to name Wayside in a release plan. Just want to point out a couple of things. One, there's a difference between counselors like Jamie James and field services folks who are working in field services. Initially, there was a defendant in this case, Jamie James, who Peterson testified that he had spoken to over ten times about a request to go to Wayside and he said that each time he was rebuffed, but this person is obviously not defendant Drennan. I just want to make sure that it's clear that the number of times that Drennan even heard the term Wayside on this record is two, one in June or July of 2018 when he passed along the Homeless Plan to the Parole Resource Group and then in December 2018 when he was serving as a grievance officer. And as to the point about when he heard from Peterson as a grievance officer that, of course, his role as a grievance officer is to determine whether the grievance has merit for the review and he suggested denying that grievance and then that, of course, though didn't have any effect on the Parole Resource Group's authority and responsibility to locate a halfway house for Mr. Peterson. And, of course, his role as a grievance officer was not to investigate claims or to investigate halfway houses as Mr. Peterson had requested in the grievance. That, again, was the responsibility of the Parole Resource Group and even if Drennan was mistaken or negligent in that process, he could not be found deliberately indifferent. Unless this court has no further questions, we ask that you affirm the summary judgment entered for defendant Drennan. Thank you. Mr. Glatzman. I think not. Thank you very much. Our thanks to all counsel. The case is taken under advisement.